1              United States District Court

2           for the Southern District of California

3                                    )
4    PETER STROJNIK,                 )
                                     )    No. 19cv2210-BAS
5         Plaintiff,                 )
                                     )    June 14, 2021
6           v.                       )
                                     )    San Diego, California
7    VILLAGE 1017 CORONADO, INC,     )
                                     )
8         Defendant.                 )
                                     )
9

10        TRANSCRIPT OF ORDER-TO-SHOW-CAUSE HEARING
           BEFORE THE HONORABLE CYNTHIA BASHANT
11             United States District Judge

12   APPEARANCES:

13   For the Plaintiff:      PETER STROJNIK
                                 Pro Se
14
     For the Defendant:      VILLAGE 1017 CORONADO, INC.
15                               PHILIP H. STILLMAN
                                 Attorney at Law
16

17

18

19

20
     Court Reporter:         Dana Peabody, RDR, CRR
21                           District Court Clerk's Office
                             333 West Broadway, Suite 420
22                           San Diego, California 92101
                             DanaPeabodyCSR@gmail.com
23

24

25

1                    San Diego, California, June 14, 2021

2                              *   *   *

3          THE CLERK:  Calling Matter Number 18, 19cv2210,

4    Strojnik versus Village 1107 Coronado, Inc., on calendar for an

5    order-to-show-cause hearing.

6          MR. STROJNIK:  My name is Peter Strojnik.

7          THE COURT:  Good afternoon.

8          MR. STROJNIK:  Good afternoon.

9          MR. STILLMAN:  Good afternoon, Your Honor.  Philip

10   Stillman.

11         THE COURT:  Good afternoon.

12      Okay.  Back in April I ordered Mr. Strojnik provide bank

13   statements for accounts where he deposited the settlements

14   received from January 1, 2018, to the present, including

15   donations of 1.2 million, as represented to the Court, and,

16   two, an explanation of how he finances his travel, home, and

17   personal expenses.

18      Have you complied with that order to provide those

19   documents?

20         MR. STROJNIK:  I have, Your Honor.

21      With respect to the $1.2 million, I indicated through my

22   filings that that was a direct assignment.  I did not have the

23   right -- I did not have access to the documents, but I did

24   indicate if the Court wanted to see them I would try to get

25   them and then file them under seal because they are private,

1  confidential tax documents.

2       THE COURT:  Okay.  And have you provided the bank

3  statements for all the accounts where you have deposited

4  settlements received?

5       MR. STROJNIK:  Yes, ma'am.

6       THE COURT:  Okay.

7       MR. STILLMAN:  That is incorrect, Your Honor.

8       THE COURT:  Okay.

9       MR. STILLMAN:  First of all, let's just start with the

10 bank records.  Mr. Strojnik provided records from

11 September 2018 through March 2021.  He was ordered to provide

12 them from January 1, 2018, through the present.

13      Now, I guess you could say, well, the order came out in

14 April, so "the present" means before April.  But I think a fair

15 reading of that means through the present.

16      He also didn't provide any records for the two accounts

17 that he did identify as apart from this Lunar Eclipse, LLC.  He

18 didn't provide any records for the Navy Federal account, which

19 he identified in his OSC response, nor any records from the

20 Bank of Hawaii, which he also identified.  He didn't produce

21 any documents that show any of his assets.  He didn't identify

22 any of the accounts.  There are two accounts that are listed

23 that were already transferred over $400,000 to.  He hasn't

24 identified any of those accounts.

25      And in -- concerning this foundation of this alleged

1   donation, Mr. Strojnik claims to have assigned his checks to

2   this company, this nonprofit.  Obviously, he has checks that

3   show that he's been -- that those checks were assigned.  He

4   has -- obviously has records showing what he did with that

5   account, and he was ordered to produce those.  He now says,

6   well, I have control over them, but I don't have permission

7   from the nonprofit to produce them, but I'll produce them in

8   camera.

9       Well, Your Honor, you've already ordered him to produce

10  them, so that objection doesn't go anywhere.  Not only does it

11  not go anywhere, but he's waived it by making that an issue in

12  terms of what he received and what he's done with the proceeds

13  of that money that he's received over the years.  He

14  represented it to the judge in the Northern District.  He

15  represented it to you.  So there are other issues.

16          THE COURT:  Okay.  So you say he turned over

17  September 2018 to March 2021.  What accounts did he turn over?

18          MR. STILLMAN:  One account, an account that's in the

19  name of Lunar Eclipse 1, LLC, which is apparently a Nevada LLC,

20  although I wasn't able to find any records for it online with

21  the Secretary of State, but I'm assuming that's what it is,

22  assuming that's still in good standing, and other than that, he

23  did not produce any bank records whatsoever.

24          THE COURT:  So --

25          MR. STILLMAN:  And he also -- I'll write this off to a

1   mistake, but, interestingly enough, he failed to produce a

2   November 2020 statement for Lunar Eclipse 1 where I believe it

3   shows even more settlements being deposited into the Lunar

4   Eclipse account.

5            THE COURT:  Mr. Strojnik, there's a mention of a Naval

6   Federal Credit account.  Do you have a Naval Federal Credit

7   account?

8            MR. STROJNIK:  Yes, I do.

9            THE COURT:  And have you ever deposited any

10  settlements into that account?

11           MR. STROJNIK:  No, ma'am.

12           THE COURT:  What about Bank of Hawaii?

13           MR. STROJNIK:  Bank of Hawaii?

14           THE COURT:  Do you have a Bank of Hawaii account?

15           MR. STROJNIK:  Bank of Hawaii gets my Social Security

16  check.

17           THE COURT:  Is there anything that has been deposited

18  into this Bank of Hawaii account other than your Social

19  Security check?

20           MR. STROJNIK:  I don't believe so, Your Honor.

21      Now, with respect -- and I want to just tell the whole

22  story because there's some fishing going on here that I don't

23  fully understand, so let me try to explain.

24      I opened the Lunar Eclipse account for the specific purpose

25  of depositing amounts into it.  The --

1          THE COURT:  "Amounts" meaning any settlements that

2    you've ever gotten, you deposited into the Lunar Eclipse 1

3    account.  Is that correct?

4          MR. STROJNIK:  Correct.

5          THE COURT:  So you've never deposited any settlements

6    that you've received into any other account other than the

7    Lunar Eclipse account?

8          MR. STROJNIK:  I have no other accounts other than the

9    Hawaii account, which was opened, I don't know, a couple years

10   ago, and then there's an account with the Navy Federal union

11   that was opened, I don't know, also a couple years ago.

12         THE COURT:  So my question is, has every settlement

13   that you've ever gotten been deposited into the Lunar Eclipse 1

14   account?

15         MR. STROJNIK:  Yes.

16         THE COURT:  Okay.  And do you have any other accounts

17   besides the Naval Federal account and the Bank of Hawaii

18   account?

19         MR. STROJNIK:  I'm sorry, I don't hear well.

20         THE COURT:  Do you have any accounts other than the

21   Naval Federal account and the Bank of Hawaii account?

22         MR. STROJNIK:  No, ma'am.

23         THE COURT:  So you opened the Lunar Eclipse account in

24   order to settle the settlements into --

25         MR. STROJNIK:  To deposit the settlements and to pay

1  off the people who get paid out of that account.  All the

2  checks that were ever deposited or ever received went into that

3  account.

4      Now, I'm very cautious when I produce information that is

5  produced essentially under oath, so two things happened in this

6  case.  In one order to show cause, you asked me what is the

7  amount of money in each of the accounts that I have.  Now, as

8  soon as I got that, as soon as I got that, I looked it up, and

9  I sent it back to you I think the same day that I got the

10  order.

11      Now, the reason why I do that is because Mr. Stillman likes

12  to say, well, that, you know, he waited 14 days and got all the

13  money out.  I wanted to make absolutely sure that you were

14  aware that the amount of money in these accounts was exactly

15  what it is at the time that I received your order.  And the

16  same thing happened with the second order, which is the order

17  for the documents.  And I sent all of those to you I think

18  within a day or perhaps two days and --

19              THE COURT:  Is that on the docket?

20              MR. STROJNIK:  Well, it is, but funny thing.  I can't

21  access it.  It says you're not an authorized person.  But,

22  yeah, it's on the docket.

23              THE COURT:  I didn't see anything like that on the

24  docket.

25              MR. STROJNIK:  It's huge.

1          MR. STILLMAN:  Your Honor, I believe that in all

2    fairness to Mr. Strojnik, it's -- I have it as an exhibit, and

3    I can point you to.  He did produce records from -- it's

4    file-stamped May 4, Document Number 40, and that's the -- that

5    is the bank that was a response to the modified order to show

6    cause and then the bank records that he produced from the Lunar

7    Eclipse account.

8          MR. STROJNIK:  While we're talking about the docket,

9    do you have access to them as we speak right now, Your Honor?

10          THE COURT:  I don't.

11          MR. STROJNIK:  In any event, you will, obviously,

12    because they are on the docket.  I don't know if the Court got

13    a copy of my motion for order to show cause.

14          THE COURT:  Yes, I did.  I reviewed that.  It's a

15    motion for order to show cause regarding Mr. Stillman's claims

16    for attorney's fees claiming that he had a flat-fee arrangement

17    with his client, and to the extent you're moving to reconsider

18    the attorney's fees ordered by this Court in January of this

19    year, that will be denied.

20          MR. STROJNIK:  Well, of course, Your Honor.  I'm not

21    asking any reconsideration.  I think the Court did what the

22    Court did.  It was -- the Court's decision was based on the

23    statements by Mr. Stillman.  And the only thing that I was

24    concerned about is that Mr. Stillman would come to the Court

25    and swear under oath that he -- that he was -- that his client

1   paid him $21,000.

2        THE COURT:  Okay.  I'm only interested today in

3   whether you've complied with my court order in keeping with the

4   OSC.  So I'm trying to get to the bottom of what documents you

5   produced and what documents you have not produced.

6        Now, are there -- what happened to January 1, 2018, to

7   September 20th, 2018, those bank records for Lunar Eclipse?

8        MR. STROJNIK:  I think the bank account was opened in

9   September.  I gave you every account or every month on that

10  account.

11       THE COURT:  Okay.  And there was an allegation that

12  November was missing, November 2020.  I'm sorry.

13  November 2020.

14       MR. STROJNIK:  That's news to me.  It's all in the

15  court file, and I filed everything.

16       THE COURT:  Okay.  And then what about March of 2021

17  until today's date?

18       MR. STROJNIK:  As I indicated earlier, my practice is

19  to make sure that nobody accuses me of doing it, as is

20  obviously done in this case, of doing anything improper.  As

21  soon as I get the orders, I satisfy them.

22       THE COURT:  Okay.  Mr. Stillman?

23       MR. STILLMAN:  Yes, Your Honor.

24       At least two other undisclosed accounts are disclosed in

25  the Lunar Eclipse 1 documents into which, as I said, one

1  account got 312 -- total $312,000, and then the other one --

2  they're both at Chase.  The other one received 126,000 out of

3  the Lunar Eclipse.  So if all these settlements went into the

4  Lunar Eclipse accounts and then they were transferred to some

5  other checking account or money market account as indicated in

6  the Lunar Eclipse bank statements, there's nothing to indicate

7  that Mr. Strojnik has not even indicated that he has those

8  accounts.  Yet there are all of those statements, and I have an

9  exhibit that I prepared.  I didn't know if the Court was going

10 to have an evidentiary hearing or put him on the witness stand,

11 but I'm certainly prepared to examine him if the Court wants

12 to.

13     And so then the other thing, Mr. Strojnik says, well, the

14 Navy Federal, that's only for my Social Security.  Well, bank

15 records --

16     THE COURT:  I think that was Bank of Hawaii, he said

17 the Bank of Hawaii was Social Security.

18     MR. STILLMAN:  Oh, I'm sorry.  The bank -- the Navy

19 Federal account in the three months that -- of 2018 that he did

20 produce, he deposited $10,900 into that account, so and that's

21 from the Lunar Eclipse account.  So if all the Lunar Eclipse

22 account is a LLC to hold all of Mr. Strojnik's settlements,

23 which I totaled it up to be, you know, $1.37 million, he's now

24 transferred it to two different accounts.

25     THE COURT:  Let's go ahead and put Mr. Strojnik under

1  oath.  You can testify right there.  If you could raise your

2  right hand.

3                          PETER STROJNIK,

4                    DEFENDANT'S WITNESS, SWORN

5          THE COURT:  Your name is Peter Strojnik.  Is that

6  correct?

7          THE WITNESS:  Strojnik.

8          THE COURT:  Your name is Peter Strojnik.

9      Go ahead, Mr. Stillman.

10          MR. STILLMAN:  I have an exhibit binder.  Would you

11  like a copy?

12          THE COURT:  Sure.  I'm not a fan of binders, but I'll

13  take it.

14          MR. STILLMAN:  Well, I can send it to you as a PDF

15  file.

16          THE COURT:  That's all right.  I'd rather get it done.

17          MR. STILLMAN:  Wearing masks.

18          THE COURT:  I don't have any problem with you taking

19  it off, especially if you've been vaccinated.

20                      DIRECT EXAMINATION

21  BY MR. STILLMAN:

22  Q.  Mr. Strojnik, you received -- take a look at Exhibit 1,

23  please.  Exhibit 1 is the order for attorney's fees.  You saw

24  that order, right?

25  A.  Correct.

1  Q.  And you received it?

2  A.  Yes, I did.

3  Q.  Okay.  And you see the order requires you to pay $21,995 in

4  attorney's fees forthwith.  Do you see that?

5  A.  Yes.

6  Q.  You didn't pay me, did you?

7  A.  No.

8  Q.  And the order was entered on January 19th.  What does

9  "forthwith" mean to you as a former attorney?

10  A.  What now?

11  Q.  What does "forthwith" mean to you as a former attorney?

12  A.  It means the same as the former attorney or as an attorney.

13  It means right away.

14  Q.  All right.  And you claim that you didn't pay the

15  attorney's fees as ordered because your ex-wife, who you live

16  with, has a lien on all of your assets and future income,

17  right?

18  A.  No.

19  Q.  Well, you want to take a look at Exhibit 8.

20        THE COURT:  I think it was compound, Counsel.

21        MR. STILLMAN:  Sure.

22  BY MR. STILLMAN:

23  Q.  Why didn't you pay the attorney's fees as ordered?

24  A.  Because I'm under a prior order by the La Paz County

25  Superior Court to pay my wife certain amounts for spousal

1  maintenance, and I'm also under the order to pay certain

2  arrearages in the amount of, I think, $491,000, and, as I

3  recall, the question was that there was a lien -- the reason

4  why I can't pay is because the lien.  The lien is a result of

5  the judge's order.  The lien was actually entered sometime, I

6  believe, in August of -- when it was first filed in December of

7  2013.  It was filed in 2018.  And in March of 2021, it was

8  reaffirmed by the La Paz County Superior Court judge who also

9  found the amount of arrearages to be, as I indicated,

10 approximately $491,000.

11 Q.  So, Mr. Strojnik --

12 A.  Hold on.

13 Q.  -- we're going off target here.

14    Is it true that the reason that you aren't able to pay the

15 attorney's fees is because of the lien that you're just

16 referring to?

17 A.  No, the fact is, I have no money.

18 Q.  You have no money.  So you have an inability to pay because

19 you don't have any money, right?

20 A.  That is correct.

21 Q.  So if the lien wasn't there, you would still not be able to

22 pay your attorney's fees?

23 A.  If the lien were not there, I would still not -- of course

24 not.  I have no money.

25 Q.  All right.  So the lien is irrelevant?

1  A.  It's not irrelevant.  It's highly relevant.

2  Q.  If it --

3  A.  Prior --

4        THE COURT:  Wait.  We're going to stop for a minute.

5  You can't talk at the same time, so ask your question,

6  Mr. Stillman.  What is your question?

7  BY MR. STILLMAN:

8  Q.  What reasonable steps, if any, did you take in order to

9  comply with this Court's order to pay the attorney's fees?

10  A.  I reviewed my financial condition.  I reviewed the orders

11  of the Court dated 2013, December of 2013, in the La Paz County

12  Superior Court.  I reviewed the obligation under Arizona

13  spousal maintenance law.  I reviewed the amount of money I was

14  owing on that.  I reviewed the fact that the court ordered me

15  back in 2013 to -- or ordered -- permitted Mrs. Strojnik to

16  file a lien.  I reviewed the lien.  The lien was valid.  I

17  reviewed my bank accounts.  I realized that I had no money to

18  pay, and I realized that even if I did have money to pay, I

19  would have to pay to Mrs. Strojnik, and I concluded that I was

20  unable to comply with the order of the Court although I would

21  very much liked to have done so.

22  Q.  How much money are you obligated to pay Mrs. Strojnik a

23  month pursuant to your marital settlement agreement?

24  A.  Which one?

25  Q.  Whichever one is in effect.

1    A.    15,000 a month.

2    Q.    When was the last time you made a payment to Mrs. Strojnik?

3    A.    Probably a month ago.

4    Q.    All right.  Have you made payments from the Lunar Eclipse

5    account to Mrs. Strojnik?

6    A.    I don't recall.  I could have just sent over a check.

7    Q.    From the Lunar Eclipse account?

8    A.    No, I don't think so.

9    Q.    Where would it have come from?

10   A.    There was $7,500 that was an old debt that was owed to me

11   that I signed over.

12   Q.    Okay.

13   A.    Just -- there was another minor amount, maybe $1,350, that

14   may have been deposited in the account.  I don't remember.

15   Maybe it was just signed over to Mrs. Strojnik.  And that's all

16   that I recall.

17   Q.    When was the last -- when -- how much money have you paid

18   to Mrs. Strojnik pursuant this lien from, say, 2018 to the

19   present?

20   A.    Well, in 2013, my spousal maintenance obligation was

21   $25,000 a month plus approximately $7,250 for rent, the rent to

22   the house, plus living expenses.  So if you multiply that by 12

23   months, that come to about $400,000.  You multiply that by

24   eight, that's about $3.2 million.  If you take away what I owe

25   now, which is about $500,000 --

1          THE COURT:  I don't think you're answering the

2    question.  The question was, how much money have you paid to

3    Mrs. Strojnik pursuant to the lien from 2018 to the present?

4          THE WITNESS:  I thought it was 2015.  Let me go back.

5          THE COURT:  Answer the question that's asked.  How

6    much money have you paid to satisfy the lien since 2018?

7          THE WITNESS:  I don't know 2018.  I can tell you from

8    2013, approximately 2.7 million.

9    BY MR. STILLMAN:

10   Q.   So you paid 2.7 million between 2018 and the present?

11         THE COURT:  No, between 2013 and the present.

12   BY MR. STILLMAN:

13   Q.   I'm asking about 2018 to the present.

14   A.   I don't know.  I don't know.  I'd have to figure it out.

15   Well, you can extrapolate.

16   Q.   No, I want you to -- I'm asking you how much, if you know.

17   If you -- if it's pure speculation, you know as a lawyer,

18   former lawyer --

19         THE COURT:  Wait.  Just --

20         THE WITNESS:  I don't know.

21   BY MR. STILLMAN:

22   Q.   Okay.  And you don't know if it came from the Lunar Eclipse

23   account or not?

24   A.   The thing that I don't know, it came from somewhere, I

25   don't know where it came from?  I don't understand.

1    THE COURT:  I believe he testified that he does not
2  believe he paid anything to his wife under the -- from the
3  Lunar Eclipse account, but maybe I'm wrong.
4    Is that correct, have you paid anything to your wife from
5  the Lunar Eclipse account?
6    MR. STROJNIK:  Right, everything goes out of the Lunar
7  account.
8    THE COURT:  So you paid your wife out of the Lunar --
9    MR. STROJNIK:  He was talking about phantom accounts.
10  Those are not my accounts.  Those are Mrs. Strojnik's.
11  BY MR. STILLMAN:
12  Q.  What are Mrs. Strojnik's?
13  A.  The ones you were talking about earlier.  You said you
14  found one for $300,000.  Boy, I'd like to have that.
15  Q.  Mrs. Strojnik, the transfers from the Lunar Eclipse account
16  to Mrs. Strojnik when there's an indication that it's
17  transferred from a checking -- from your account to a checking
18  account, that's got -- that has the --
19    THE COURT:  From Chase.
20  BY MR. STILLMAN:
21  Q.  From Chase.
22  A.  I don't have that.
23  Q.  That is, I think, 8856.
24  A.  I don't have an account with Chase.
25    THE COURT:  There was a payment of $312,000 from the

1   Lunar Eclipse account to Chase.

2         THE WITNESS:  That would have been Mrs. Strojnik's

3   account.

4         THE COURT:  There was 126,000 transferred from the

5   Lunar Eclipse account to Chase.

6         MR. STROJNIK:  Again, I don't have any account with

7   Chase.  That would have been probably for the payment of costs

8   and fees.

9         THE COURT:  Payment of costs and fees to whom?

10        MR. STROJNIK:  To my assistant.

11        THE COURT:  To your assistant for the cases that

12  you're working on?

13        MR. STROJNIK:  Correct.

14        THE COURT:  So the 126- was for your assistant, and

15  the 312,000 was for your wife?

16        MR. STROJNIK:  All I can tell you is that none of that

17  money went to me.  What I can also tell you is that 300,000

18  sounds probably about right.  I know that I have no account

19  with Chase.  So I assume that the 300,000 must have gone to

20  Mrs. Strojnik, and I assume 120- must have gone to the

21  assistant.  And the reason for that is very simple, Judge.  I

22  don't have an account there.

23        THE COURT:  But you don't remember transferring

24  $312,000 to someone for something?

25        MR. STROJNIK:  Over five years, no.  It

1  wasn't -- nobody says it was -- it was a large sum.  These

2  checks are transferred out as they arrive.  And they are

3  immediately swept out of the Lunar account into the appropriate

4  accounts.  Under -- I will tell you one more thing.  Under the

5  current order of the La Paz County Superior Court, these

6  accounts are automatically swept out into Mrs. Strojnik's

7  account or the account of assistant payables.

8  BY MR. STILLMAN:

9  Q.   That's not actually true, is it, Mr. Strojnik?

10 A.   It's actually true.

11 Q.   You deposited -- I tallied up all of the accounts, and it's

12 Exhibit 20 -- 19, Your Honor, if you want to take a look -- but

13 I tallied up all of the deposits into the account, and they

14 total up $1,777,845.

15 A.   What, where, how, what, who?

16 Q.   Sure.  If you want to take a look at Exhibit 19.

17 A.   Okay.  What about it?

18 Q.   Now, whose got the money market account that ends in 5856?

19 Who gets that money?

20 A.   I don't.

21 Q.   Who gets it?

22 A.   I don't.  I don't know who.  I think it's probably

23 Mrs. Strojnik.

24 Q.   It's your account.

25 A.   What?

1    Q.   Your account.  Who got it?  You don't make those wires

2    transfers?

3    A.   No.

4    Q.   Who does?

5    A.   Mrs. Strojnik.

6    Q.   So Mrs. Strojnik has control over the Lunar Eclipse bank

7    account?

8    A.   That is correct.

9    Q.   You don't have signatory authority over the bank account?

10   A.   Sure, I do.

11   Q.   You do?

12   A.   Yes.

13   Q.   But she has signatory authority as well?

14   A.   She has a court-ordered right to sweep out the money into

15   her account because I'm $500,000 behind on spousal maintenance.

16   She -- I have a judgment that says this is what Mrs. Strojnik

17   gets to do.

18   Q.   Mr. Strojnik, does she or does she not have the right to

19   transfer on her own money from the Lunar Eclipse account?

20   A.   Yes.

21   Q.   She does.  So she's got -- she's a signatory on that

22   account?

23   A.   She has the right to transfer it out.  I don't know if

24   she's a signatory.  I assume she is.

25   Q.   Well, how does she transfer money from the Lunar Eclipse

1    account?

2    A.    She goes to the computer and says blah, blah, blah, blah,

3    blah, and it goes from one account to the next account.

4    Q.    Does she have her own password or does she use yours?

5    A.    Do what now?

6    Q.    Does she have her own password to get that that account or

7    did she use yours?

8    A.    Cash?

9    Q.    Password.

10   A.    Password.  I'm sure -- I don't have a password.

11   Q.    So who has the account ending in -- check account at Chase

12   ending in 7224?

13   A.    I don't know.

14   Q.    Well, that one received $128,000, I believe -- I'm sorry,

15   136,744.  Who has that account?

16   A.    I don't know.

17   Q.    You don't know?

18   A.    It's probably the assistant's.

19   Q.    And how does the money get transferred to him or her?

20   A.    I think it's transferred -- I think that one may be

21   transferred by check.

22   Q.    And no, we're talking about --

23   A.    Wait, wait.

24            THE COURT:  You can't talk at the same time.

25            MR. STILLMAN:  Sorry, Your Honor.

```
 1              THE COURT:  Ask your next question.
 2   BY MR. STILLMAN:
 3   Q.   These are all online transfers, not checks.  How are those
 4   done?
 5   A.   Those what?
 6   Q.   Those transfers to the 7224 account.
 7   A.   I don't know whose account that is.
 8   Q.   So who -- what is the name of your assistant?
 9   A.   Danielle Kristen Jones.
10   Q.   I'm sorry?
11   A.   Danielle Kristen Jones.
12   Q.   And where does she live?
13   A.   In Phoenix.
14   Q.   What's her address?
15   A.   I don't know.
16   Q.   You paid your assistant $137,000, and you don't know her
17   address?
18   A.   Correct.
19   Q.   Now, the money market account, that 5856, you say that's
20   Mrs. Strojnik's?
21   A.   I say that's probably Mrs. Strojnik's.  I don't know
22   account numbers.
23   Q.   Who else has signatory authority on the Lunar Eclipse
24   account but you?
25   A.   I think that's it.
```

1   Q.   Who owns Lunar Eclipse?

2   A.   I do.

3   Q.   You own 100 percent of it?

4   A.   Correct.

5   Q.   Now, so other than looking -- reviewing your records, what

6   steps did you take to comply with this Court's order?

7   A.   Well, as I said earlier, I looked at the order.

8   Q.   Other than what you've already testified to.  What actual

9   steps, other than reviewing your records, did you take to

10  comply with the Court's order?

11  A.   I don't want to go through it again because I don't want to

12  say something that's not absolutely accurate.  First of all, I

13  looked at the order, and I was disappointed, and then I looked

14  at my financial condition.

15          MR. STILLMAN:  I think this is nonresponsive.

16          THE COURT:  I'm not sure what you're asking for,

17  Counsel.

18          MR. STILLMAN:  Sure.  I'm sorry then.  If you don't

19  understand it, then I'd better rephrase it.

20      Mr. Strojnik when I asked, he said he reviewed various

21  financial records.  I'm asking other than reviewing his

22  financial records, what steps, if any, did he take to comply

23  with your order?

24          THE COURT:  Like transferring the money?

25          MR. STILLMAN:  Like going to family court and saying,

1    I've got to pay this attorney's fee order.  Going to try and

2    get a loan.  Looking at the settlements and trying to sign a

3    settlement to pay for that.

4            THE COURT:  Did you do any of those things?

5            MR. STROJNIK:  No.

6            MR. STILLMAN:  So the only thing you did to comply

7    with the order is review your records.  Is that correct?

8            MR. STROJNIK:  Whatever I said before.  I reviewed the

9    records, I reviewed the divorce decree, I reviewed the divorce

10   documents, I reviewed the UCC one dated 2013 and the green

11   statement of 2018, I figured out what I owe, and I concluded

12   that I have no money to pay you although I would love to pay

13   you.

14   BY MR. STILLMAN:

15   Q.   I'm sure.

16        So after the order was entered in January of 2021 --

17   A.   what order?

18   Q.   The attorney's fees order --

19   A.   Okay.

20   Q.   -- that we're here today on, you deposited, according to

21   your Lunar Eclipse account, $88,620 --

22   A.   Okay.

23   Q.   -- in that three-month period from January to

24   March $88,620?

25   A.   Okay.

1   Q.   You also transferred $11,000 of that to this 7224 account

2   which you claim to be your assistant?

3   A.   Okay.

4   Q.   The attorney's fees award was $21,995.

5   A.   Okay.

6   Q.   That's well short of the 88,620, which you deposited in the

7   three months period, isn't it?

8   A.   Well, I can do the math, but I can tell you also that

9   whatever money was received between December of 2013 and

10  today's date is subject to a UCC1 priority lien as ordered by

11  the Court.

12  Q.   Now, let's -- now, on the -- so you didn't produce any

13  records about these other two accounts because you say they're

14  not yours?

15  A.   That's incorrect.

16  Q.   And --

17  A.   That is incorrect, Counsel.  Counsel --

18          THE COURT:  Wait.  We cannot talk at the same time.

19      Counsel, do you have any additional questions of -- can we

20  kind of get to the point here?

21          MR. STILLMAN:  I'm going to move to another topic.

22          THE COURT:  Okay.

23  BY MR. STILLMAN:

24  Q.   So you were ordered to produce the bank statements for the

25  nonprofit showing a purported donation of 1.2 million, correct?

1   A.   Correct.

2   Q.   And you didn't produce any of those documents?

3   A.   Correct.

4   Q.   Now, you have access to those documents, don't you?

5   A.   I do.

6   Q.   Okay.  And you haven't produced a single document showing

7   any type of assignment or payment to any nonprofit?

8   A.   Correct.

9   Q.   So what organization did you purportedly make assignments

10  of money to?

11  A.   I believe the organization was called AID -- AID

12  Corporation or AID, LLC.

13  Q.   Did that stand for Advocates for Individuals with

14  Disabilities, LLC?

15  A.   It was either a -- short for that or it was AID itself.

16  Q.   So you didn't --

17  A.   And the suggestion that you made that I did not produce

18  them is incorrect.  I actually offered the Court to produce

19  them.  I explained to the Court in my response that the

20  assignment was a direct assignment.  The Court did not ask me

21  for those documents.  The Court asked me for my documents.  I

22  have no documents.  Because of the direct assignment, I do not

23  receive any documents.  The checks are automatically assigned

24  over to AID, and they were automatically assigned over to AID,

25  but --

1  Q.   So when you --

2  A.   Excuse me.  But I did offer to the Court in order to

3  resolve any issue that the Court might have or that you might

4  have, I offered to go to my client and ask for permission to

5  produce those documents, and I was offering to produce them,

6  what do you call it, in camera so that the Court would know

7  that what I said about 1.2 million was absolutely,

8  unequivocally true.  Now, you may not believe it --

9          THE COURT:  Okay.  We're going far afield.  Let's wait

10  for the next question.

11  BY MR. STILLMAN:

12  Q.   You don't have a client, do you, sir?

13  A.   I'm sorry?

14  Q.   You don't have a client, do you?

15  A.   Of course, I have a client.

16  Q.   You're a disbarred lawyer.

17  A.   Correct.

18  Q.   You do not have any clients.  You're not able to have a

19  client, are you?

20  A.   I am my own client.

21  Q.   So are you saying that you are this foundation?

22  A.   What are you talking about?

23  Q.   Do you have any interest in this AID Foundation or

24  Advocates With Individuals With Disabilities, LLC?  Do you have

25  any interest in that?

1    A.    No.

2    Q.    None whatsoever?

3    A.    None whatsoever.

4    Q.    So when you get a settlement check, you write on the back

5    of it, "Pay to the order of AID Foundation"?

6    A.    You're talking about 2016, 2017?

7    Q.    Whenever.

8    A.    20 -- maybe early -- correct.

9    Q.    Okay.  So that's what you'd write on your checks?

10   A.    Correct.

11   Q.    And then you'd get those checks back in the mail from this

12   bank, correct?

13   A.    No, I don't.

14   Q.    You don't get copies of the cancelled checks?

15   A.    No.

16   Q.    Okay.  But you have access to them, don't you?  You can

17   call the bank?

18   A.    No, I don't.  I sign the check over.  My business is done.

19   Q.    So who do you assign -- who do you assign those checks to,

20   this $1.2 million?  Do you assign it to an individual?

21   A.    We just went over that.  Probably.  I don't remember.  Like

22   five years ago.  It says, "Pay to the order of AID, LLC," and I

23   sign my name to it.

24   Q.    Who do you hand the check over to?

25   A.    AID.

1  Q.   Who is the person that you hand the check over to?

2  A.   Who would have been the person?  I think -- I think it

3  would have been a fellow -- I see his face.  I don't remember

4  his name.  His wife runs marathons.  I don't remember.  When it

5  hits back, I'll let you know.

6  Q.   So you paid over 1.2 million to this foundation, and you

7  don't know the name of the person who you gave the checks to,

8  1.2 million, sir?

9  A.   I don't know if I -- if you were here when I said I gave it

10  to AID.  I know who AID is.  I don't know every member of AID,

11  so don't try to make it look like if I don't know this person

12  who gets the check, that I don't know AID.  I know AID.  They

13  got $1.2 million from me.

14  Q.   You don't even know the name of AID?  You don't know if

15  it's AID?

16          THE COURT:  You're getting argumentative, Counsel.

17  You're getting argumentative.  Ask your next question.

18  BY MR. STILLMAN:

19  Q.   Do you know the name of the foundation that you donated

20  $1.2 million to?

21  A.   You know what?  I'm going to look it up, and maybe that

22  will satisfy you.  Do you have a minute?  I think I have that

23  information.  And then we'll go from there.

24

25

```
 1              THE COURT:  Why don't we move on to the next question,
 2   Counsel.
 3   BY MR. STILLMAN:
 4   Q.  Did you tell --
 5   A.  I'll still looking.
 6              THE COURT:  We're going to the next question.
 7   BY MR. STILLMAN:
 8   Q.  When was the last time that you made an assignment to this
 9   entity known as AID?
10              MR. STROJNIK:  I would imagine probably in 2017.
11              MR. STILLMAN:  2017.
12              MR. STROJNIK:  I would venture to say that, yes.
13   BY MR. STILLMAN:
14   Q.  And who did you talk to at AID about the fact that you were
15   assigning 1.2 million to that organization?
16   A.  What do you mean?
17   Q.  who did you talk to at that organization to tell them that
18   you were making that kind of a donation?
19   A.  I didn't make a donation all in one lump sum.  That was
20   done over several years.  It was when the checks came in from
21   my attorney's fees that I earned that I turned then over to
22   AID.  There is an accounting of that that I had offered for the
23   Court's in camera review, and if the Court wants me to, I can
24   probably find them on my phone, and I can email them to you.
25              THE COURT:  We're getting beyond the question.  The
```

1    question was, who did you talk to with the organization to tell

2    them you were making a donation?

3            THE WITNESS:  You mean how did we make the deal?

4            THE COURT:  Who did you talk to, if you know?

5            MR. STROJNIK:  Okay.  There's a fellow named

6    Greg Crane, who is extraordinarily disabled.  He decided to do

7    something for the disabled community.  I was retiring.  He came

8    to me and he said, can you this for us?  Can you be a lawyer

9    for us?  But we can't pay you.  So whatever you do, whatever

10   money you make, you give it to us, so we can run -- so we can

11   buy beds, so we can buy wheelchairs, so we can buy things for

12   the disabled community.  I was at that time ready to retire.

13   And I said, yeah, fine, let's do it.  And I received absolutely

14   not a dime of that because that was the deal between two guys,

15   and that deal stood.

16       By the way, the accident that caused him to be highly

17   disabled --

18           THE COURT:  That's far beyond the scope.  I'm trying

19   to get you out of here and not have you have to bring your

20   toothbrush tonight, Mr. Strojnik.

21       Go ahead.

22           MR. STROJNIK:  I appreciate that.

23           THE COURT:  Just wait for the next question.

24   BY MR. STILLMAN:

25   Q.  Now, did you hand the check over to this Greg Crane?

1  A.  I don't know if -- I told you this about a thousand times

2  now.  It was not one check.  It was a number of checks.  I

3  didn't hand it to anybody.  I signed it over.

4  Q.  And did what with that check?

5  A.  I gave it to the company personnel who was in charge of the

6  checks, and they took it to the bank or they deposited it

7  somehow.

8  Q.  And who was that person that you gave it to?

9  A.  And I believe I told you that, too.  I said I visualize his

10  face.  I remember his wife ran marathons, but I can't remember

11  his name right now.

12  Q.  Did you ever get an accounting of how that money was spent?

13  A.  I believe so, yes.

14  Q.  And where is that accounting?

15  A.  I offered it to the Court for in camera inspection.

16  Q.  Well, you were ordered to produce it.  Why?

17  A.  I was not ordered to produce it.

18        THE COURT:  You're getting argumentative, Counsel.

19  This is an evidentiary hearing.  Ask your question.

20  BY MR. STILLMAN:

21  Q.  What other than this AID, which may or may not stand for

22  something -- did you make any donations or assignments to other

23  charities?

24  A.  Myself?

25  Q.  Yes.

1  A.   No, not that I recall.

2  Q.   What about on your behalf by Lunar Eclipse?

3  A.   No, Lunar didn't do that.

4  Q.   When -- now, you were ordered to produce records showing

5  your assets.  You didn't produce any documents showing your

6  ownership of Lunar Eclipse 1, did you?

7  A.   I was ordered to show not only the ownership of Lunar

8  Eclipse, I was ordered to show all the bank statements, and I

9  produced each and every bank statement as of the time that I

10  was ordered to do it.  I was also ordered -- just calm down.  I

11  was also ordered to show the amount of money that was in

12  the -- in the Hawaii account, which I immediately copied, I

13  immediately pasted into a document, I immediately sent to the

14  Court.  I was also ordered to show the -- what do you call it?

15  The Navy Federal union account, which I immediately --

16           MR. STILLMAN:   Nonresponsive.

17           THE COURT:  It is nonresponsive.

18  BY MR. STILLMAN:

19  Q.   Mr. Strojnik --

20  A.   What?

21  Q.   -- did you produce the documents showing the ownership and

22  your ownership interest in Lunar Eclipse 1?

23  A.   Yes.

24  Q.   You did.  Where are they?

25  A.   You have them.  The judge has them.  Everybody has them.

1  Q.  Well, I'm going to represent to you and the Court that you

2  only produced bank records.  There's no operating agreement,

3  there are no articles of incorporation, there are no membership

4  interests.  Are you saying you produced those?

5              MR. STROJNIK:  That was not requested.  What was

6  requested --

7  BY MR. STILLMAN:

8  Q.  I just asked you if you produced them.  The answer is no,

9  right?

10 A.  No, the answer is not no.  The answer is that was never

11 requested.  I produced each and every document that the judge

12 requested I produce, every one of them, and because I know how

13 you play, I made sure --

14             THE COURT:  Let's wait for the next question.  Let's

15 wait for the next question.

16      The next question, Counsel.

17 BY MR. STILLMAN:

18 Q.  An LLC membership interest is an asset, isn't it,

19 Mr. Strojnik?

20             THE COURT:  Mr. Stillman, we're not going to have an

21 argument about what his understanding of what an asset is or

22 what an asset isn't.  I'm trying to figure out whether he has

23 the ability to pay, whether he's paid, whether he's produced

24 documents.

25             MR. STILLMAN:  Well, this goes to the order to show

1   the assets.  He didn't produce these records.

2           THE COURT:  I'm more concerned with his ability or

3   inability to pay at this point.

4   BY MR. STILLMAN:

5   Q.  What other LLCs do you have an interest in, if any?

6   A.  I don't think there's -- let's see.  Oh, I have an interest

7   in a consumer protection corporation.  I don't know if that's

8   an LLC.  I'm not sure.  It has no assets.

9   Q.  What's the name of it?

10  A.  Consumer Protection Corporation.

11  Q.  Is that a Nevada corporation?

12  A.  No, it's Arizona.

13  Q.  All right.  And who owns that?

14  A.  I do.

15  Q.  100 percent?

16  A.  Yeah.

17  Q.  All right.

18  A.  It has no assets, it has no bank accounts, it has never

19  been active.  There might be other shell corporations, but none

20  of them have any assets or bank accounts other than the Lunar

21  account.  That has a bank account, which I produced to the

22  Court and to you, and other than -- well, and that's the other

23  LLC.  The other two are personal.

24  Q.  Well, we don't know what value those assets have because

25  you haven't disclosed them to this Court or I prior to the

1    hearing today.

2    A.   I just told you, they have no assets.

3            THE COURT:   Is that a question or a statement?   What's

4    your question?

5    BY MR. STILLMAN:

6    Q.   Isn't it true that your ownership of these other

7    corporations, LLCs, are assets of yours regardless of whether

8    the companies have any money or not?   Isn't that true?

9    A.   No.

10   Q.   It isn't?

11   A.   No.

12   Q.   Okay.   What about default judgments.   How many default

13   judgments have you obtained in the last two years, let's say?

14   A.   Two.

15   Q.   Just two?

16   A.   I believe so, yeah.

17   Q.   All right.   Which ones, in what cases?

18   A.   Two in Maricopa County.

19   Q.   I'm sorry?

20   A.   Two in Maricopa County.

21   Q.   What about in federal court?

22   A.   I don't think I got any default judgment or maybe I did.   I

23   don't know.   But nobody ever collected anything.   I don't

24   remember.   I don't think I did, but I don't remember.

25   Q.   Well, those are assets, are they not?

1        THE COURT:  "Those" meaning the two default judgments

2   in Maricopa County or any federal --

3        MR. STILLMAN:  Any default judgment, Your Honor.

4        THE COURT:  Any default judgments.

5        MR. STILLMAN:  It's his understanding that default

6   judgments are assets.

7        THE COURT:  Is that your understanding?

8        THE WITNESS:  Default judgments that have a monetary

9   aspect to it are assets with respect to the monetary aspect.

10  Default judgments that are mainly injunctive have no value

11  because they simply order a person to do something.  So if I

12  were to extrapolate from the two Maricopa County judgments

13  where I think I was ordered -- I recovered $100 plus costs --

14       THE COURT:  Mr. Stillman, I'm going to stop you for a

15  minute.

16     Do you have any other questions about his ability to pay?

17  I have people waiting for me.

18       MR. STILLMAN:  I've got several different areas,

19  but --

20       THE COURT:  I think I've heard enough.

21     Any additional evidence you want to present?

22       MR. STILLMAN:  I guess I'll ask this:

23  BY MR. STILLMAN:

24  Q.  Did you disclose on your tax returns the payments to this

25  charity?

1  A.  No.

2  Q.  Did you disclose on your tax returns the amount of

3  settlement money that you received and transferred into Lunar

4  Eclipse?

5  A.  Yes.

6  Q.  And when Lunar Eclipse pays, as I understand, it pays not

7  only money to Mrs. Strojnik, but it also pays various living

8  expenses, correct?

9  A.  Lunar Eclipse, yes.  I would say yes, it pays -- it pays

10  some point credit cards and business expenses, which are mainly

11  what the credit cards are used for.

12  Q.  Well, it also pays for two cars, doesn't it, a Toyota and a

13  BMW?

14  A.  No.

15  Q.  It doesn't?

16  A.  No.

17  Q.  Why don't we take a look at Exhibit 5.  Why don't you turn

18  to page 5 of Exhibit 35.  See the Bates number at the bottom?

19  A.  Yes.

20  Q.  Looking under the "Electronic Withdrawal" section, there's

21  a payment to City of Phoenix Water, right?

22  A.  Correct.

23  Q.  There's a Blue Cross/Blue Shield Arizona?

24  A.  Correct.

25  Q.  There's a Toyota financial lease.  Who's that for?

1    A.   That's for a Toyota I used to have.  It was 10-8, right?

2    Q.   This is 2019.

3    A.   October 2019.  Two years ago.

4    Q.   And a BMW, right?

5    A.   Yes.

6    Q.   Payment for that.  There's --

7    A.   It's a payment on a lease.

8    Q.   Southwest Gas, 10-15, October 15.

9    A.   Apparently, yes.

10   Q.   The electric bill?

11   A.   Yes.

12   Q.   And those are all for your residences, isn't it?

13   A.   I don't have a residence.

14   Q.   Okay.  That's for the -- I don't have the address, but

15   where you were living.  Isn't that true?

16   A.   No, that is pursuant to the agreement to pay for half of

17   the living expenses and to pay for the rent.

18   Q.   How much do you -- but those go to payments that are

19   incurred at 7867 North Central, I think -- 7847 North Central?

20   A.   What about it.

21   Q.   The gas, all that, paid out of Lunar Eclipse, that goes to

22   where you live?

23   A.   Right.

24   Q.   And you've lived there since you were divorced from

25   Mrs. Strojnik.  Isn't that true?

1  A.   Correct.

2  Q.   And prior to your divorce, you lived there?

3  A.   Correct.

4  Q.   After your divorce till the present you live there?

5  A.   Correct.

6  Q.   And you live there with your ex-wife?

7  A.   Not before we got divorced.  Before we got divorced, we

8  were married.

9  Q.   Right.  And the property -- you transferred the property to

10  her, correct, as part of the divorce?

11  A.   When?  Part of the divorce?  No.

12  Q.   When?

13  A.   That was done way before then.

14  Q.   And you continue to travel with her to all these hotels,

15  you go visit -- 70 to 80 percent of the hotels that you visit,

16  you've gone to with Mrs. Strojnik.  Isn't that true?

17  A.   What is the number, 75 percent?

18  Q.   75, 80 percent of the travel that you've been to these

19  various hotels that you've sued, you've gone to with

20  Mrs. Strojnik?

21  A.   Yes.

22  Q.   And what, if anything, do you pay Mrs. Strojnik to stay

23  there at the house?

24  A.   I'm sorry, can you say again, please?

25  Q.   what, if anything, do you pay Mrs. Strojnik to stay at 7847

1  North Central?

2  A.  I'm going to give you the exact number.  For rent and

3  living expenses, I paid $32,489.

4  Q.  A month?

5  A.  Correct.  No.  Minus 25,000.  So that amount minus 25.

6  Q.  And --

7          THE COURT:  I'm going to interrupt you for a minute.

8  I'm going to have to take a break.  I'm going to take my people

9  who are waiting for me, and then I'll be back.

10     (Recess.)

11         THE COURT:  We are back on the record.  Both

12 Mr. Stillman and Mr. Strojnik are present.

13     How much more do you have?

14         MR. STILLMAN:  I was looking at my outline, and I get

15 it from the Court, and I'm going to try to wrap things up as

16 quickly as possible.  I'm going to do my best.  You know when

17 you say I've got one more question.

18         THE COURT:  I heard the word "finally" six times in a

19 statement.

20         MR. STILLMAN:  Wait a minute.  He's taking my time.

21 BY MR. STILLMAN:

22 Q.  Mr. Strojnik, turn to Exhibit 15 -- I'm sorry, not Exhibit

23 15.  I apologize.  Exhibit 11.  Are you there, Mr. Strojnik?

24 A.  I see that.

25 Q.  That's a default judgment that you got against JW World

```
 1  Enterprises?
 2  A.  Okay.
 3  Q.  In federal court, right?
 4  A.  Correct.
 5  Q.  And dated June 2, 2021?
 6  A.  Yeah, I haven't gotten this yet.  Hold on.  This is dated
 7  June 2, 2021, right?
 8  Q.  And it was -- you were awarded $4,469?
 9  A.  Correct.
10  Q.  All right.
11  A.  Correct.
12  Q.  Not injunctive relief.  You got money, a money judgment --
13  A.  Correct.
14  Q.  -- as well?
15  A.  Correct.
16  Q.  And, in fact, you have a default pending against another
17  hotel, Sacramento hotel, right?
18  A.  Pending, that is correct.
19  Q.  So how much other default judgments do you have against
20  hotels in federal court?
21  A.  Well, the judgment in Sacramento is not a default judgment.
22  That's out of consideration.  I believe that a preliminary
23  order was to deny it, but I don't know.  Now, this one here, JW
24  World Enterprises, I don't think I've seen this.
25  Q.  Now --
```

1   A.  But as I told you earlier, I did receive two default

2   judgments recently in Maricopa County Superior Court.

3   Q.  And those are assets, aren't they?

4   A.  Of course.

5   Q.  But you didn't disclose those, you didn't produce any

6   records, did you?

7   A.  After I disclosed the information.

8   Q.  Now --

9          THE COURT:  You've got to wait for the answer.

10         THE WITNESS:  You've got to let me answer.

11         THE COURT:  You've got to wait for the answer.

12         THE WITNESS:  Those two judgments were received after

13   I had complied with the court order at that time.  And so far

14   as the value of those judgments is concerned --

15         THE COURT:  The question was not about the value.

16         THE WITNESS:  Okay.

17         THE COURT:  Mr. Stillman.

18         THE WITNESS:  I don't recall seeing this Exhibit 50.

19   BY MR. STILLMAN:

20   Q.  Now, you testified in the Northern District court that you

21   had paid about $58,000 in investigative costs.  Do you remember

22   that?

23   A.  I don't remember it, but that sounds about right.

24   Q.  Okay.  And that was paid out of the Lunar Eclipse account,

25   right?

1  A.   Right.

2  Q.   And your litigation expenses were paid out of the Lunar

3  Eclipse account, like filing fees and that sort of thing?

4  A.   Yes, that is correct.

5  Q.   And you didn't get Mrs. Strojnik's permission to do that,

6  did you?

7  A.   Yes, I did.

8  Q.   You did.  So she authorized you to spend that money on

9  litigation expenses?

10  A.   Correct.

11  Q.   And if you didn't, then you could --

12  A.   If Mrs. Strojnik said, I have a lien on those -- on that

13  money, you cannot spend it, I would not have spent it because

14  if I spent it, she could have gone to the judge in La Paz

15  County, and I could be in jail if I did that.

16  Q.   Isn't this $22,000 in litigation expense just like the

17  other litigation expenses that you incur for investigation,

18  filing fees, and the like?

19  A.   I'm utterly confused.  What are you talking about?

20  Q.   The attorney's fees that this judge ordered you to pay --

21  A.   Oh.

22  Q.   -- in this case are the same kind of expenses that you were

23  paying for filing fees, investigation fees, et cetera,

24  in -- out of this Lunar eclipse account.  Isn't that true?

25  A.   No, it's not.

1    Q.    All right.  And who pays for your food?

2    A.    I pay for half of the food.  It is -- I think I testified

3    earlier 32,000 -- approximately 250 minus 25,000.  That leaves

4    7,250.

5    Q.    So did you --

6    A.    Pardon me.  And you've got to subtract the value -- half of

7    the value of the rent of the house out of that, and what

8    remains is the food.  That was all computed, analyzed, and

9    entered into back in 2013.

10   Q.    Did you ask Mrs. Strojnik if you were authorized to comply

11   with this Court's order?

12   A.    Did I ask Mrs. Strojnik if I was authorized to comply with

13   this Court's order?  No.

14   Q.    What settlements have you entered into between March of

15   2021 and the present?

16   A.    I believe one.

17   Q.    What was that?

18   A.    That was one in Arizona.  I don't remember the name of the

19   case.  It was a property that was in Kingman, and it settled,

20   and I believe the settlement was assigned.

21   Q.    Is that the only one?

22   A.    I don't know.  There could be another one.  March 1st?

23   Q.    Yep.

24   A.    I don't remember another one.

25   Q.    Okay.  Why don't you turn to Exhibit 13.

1    A.    All right.

2    Q.    That was a settlement of a case against the Wyndham here in

3    San Diego, isn't it?

4    A.    I've got to look at this.

5    Q.    Why don't you look at the last page, Mr. Strojnik.

6    A.    No, I'm going to look at the whole thing.  Yes, I remember

7    this one.

8    Q.    Would you look at the last page, sir?

9    A.    Sure.

10   Q.    Is that your signature?

11   A.    Yes.

12   Q.    And that's dated April 12th when you signed it?

13   A.    Correct.

14   Q.    And the total amount paid was how much?

15   A.    I believe this is the one for three payments that I

16   referenced earlier of 1,583, as you recall.

17   Q.    Starting when?

18   A.    I told you earlier that I got 1,515, 1,550 or 1,583.  This

19   is the one.  And it starts -- let's see.  25th of each

20   successive month until paid.  And the successive months would

21   have been May and June and July.

22   Q.    Any other settlements that you recall, sir?

23   A.    I don't recall.  As I took -- there's another one for

24   $3,000, but I -- I think that one is out of Kingman.

25   Q.    I just want to make sure one point, though.  All the money

1  that's in -- that was deposited into the Lunar Eclipse 1

2  account were settlements from your cases, correct?

3  A.   No.   I mean, I don't know.   What is correct is that all the

4  settlements were deposited into the Lunar Eclipse account.

5  Q.   What other monies -- what other sources of income do you

6  have that were deposited into the Lunar Eclipse account?

7  A.   Well, I told you earlier that I got payment on an old debt.

8  I don't think that went to Lunar.   I think that went directly

9  to Mrs. Strojnik.   As I told you, I have Social Security I

10 receive.   That's about it for my income.   So based on the lack

11 of any other income, I would say that you're probably correct,

12 probably all the money that goes into the Lunar account is

13 probably, I mean, almost certainly from settlement income and

14 potentially received of old debt.

15 Q.   Did you get a K1 from Lunar Eclipse?

16 A.   Come again?

17 Q.   Did you get a Schedule K1?

18 A.   Yeah.

19 Q.   You do?   And do you pay your taxes every year?   Do you file

20 a tax return every year?

21 A.   Of course, I do.

22 Q.   And so it's true that you don't pay all of the money that

23 you get in settlements to Mrs. Strojnik, right?

24 A.   Correct.

25 Q.   You use it for continuing to litigate against hotels, don't

1    you?

2    A.    Correct.

3          MR. STILLMAN:  Your Honor, I'm going to wrap it up

4    with that.

5          THE COURT:  Okay.

6          MR. STILLMAN:  I would like -- a couple of tactical

7    points for you, Your Honor, if I may.  One is, all of the

8    exhibits in this binder are basically from the files, so,

9    technically speaking, the Court can take judicial notice of all

10   of the documents that are from the files from the court

11   records.

12      So I would like to -- I would like to just move all of

13   those court records into evidence to the extent that I need to.

14         THE COURT:  I think I can take judicial notice of the

15   court orders.

16         MR. STILLMAN:  The only thing you can't take judicial

17   notice of are two documents that are a couple of documents, and

18   I want to call your attention to them, Judge.  Exhibits 17 is a

19   list of all of Mr. Strojnik's open cases; that is the pending

20   cases in federal court that have not yet been adjudicated in

21   one way or another or listed as being open, so that's obviously

22   judicial notice, but I wanted to call that to your attention,

23   Your Honor.

24      Same thing with Exhibit 15, which is a list of

25   Mr. Strojnik's Arizona cases in state court that are currently

1  filed, and that doesn't show what the results of those are, but
2  I believe those are open cases as well.

3     Exhibit 19 I'd like to offer into evidence.  That is a
4  document, and I can establish it for you, Your Honor, but that
5  is a document which summarizes all of the deposits of -- into
6  the Lunar account, the Lunar Eclipse account, and that breaks
7  it down by month and year.  So there's -- you can see each
8  month what's been deposited in those accounts and the sum total
9  for each year, and then -- and then there's a column that shows
10  the money transferred to the money market account and the
11  column showing the money that's transferred into this checking
12  account, this 7224 account, and then there's an account,
13  there's a -- external wire transfers which were just reflected
14  as wire transfers.  So I ask the Court to admit them.  I
15  prepared it from the records.

16     THE COURT:  I'll consider it.  It's like closing
17  argument.  I'm not sure it's something that we can admit in
18  evidence.

19     MR. STILLMAN:  And, honestly, Your Honor, I ask that
20  the Court -- I'm happy to testify about it, but I prepared as
21  Exhibit 20 the expenses and attorney's fees that were incurred
22  in preparing for and attending this contempt hearing, and so
23  they're itemized down by time and date, and I ask that the
24  Court -- if you want me to lay a foundation for it, I can.

25     THE COURT:  This is for the additional fees for

1   today's hearing?

2           MR. STILLMAN:  Correct.

3           THE COURT:  Okay.  And so the 22,000 is on top of

4   the --

5           MR. STILLMAN:  That's correct.

6           THE COURT:  -- the 21,000?

7           MR. STILLMAN:  Correct.

8           THE COURT:  Okay.

9           MR. STILLMAN:  And then Exhibit 21 is a settlement

10  agreement.  Now, that's dated in October of 2020.  That was

11  filed in the district court in Arizona which held Mr. Strojnik

12  to be a vexatious litigant and refers specifically to this

13  settlement agreement because Mr. Strojnik has testified that he

14  had $5,000 out of 13 settlements, and this one settlement shows

15  a payment of $7,500 in October of -- well, the settlement

16  signed fifth day of October 2020, and the reason I think that's

17  somewhat significant apart from just, you know, the

18  discrepancies between what Mr. Strojnik represents to the Court

19  for his finances and what is actually the case is that this is

20  dated, as I said, October 5, 2020.  Coincidentally,

21  November 2020 is the month, the only month, that Mr. Strojnik

22  did not produce the bank record from Lunar Eclipse.

23      So -- and with that, that is all I have from an evidentiary

24  point.

25          THE COURT:  Okay.

1          MR. STILLMAN:  Would the Court like to hear closing?

2          THE COURT:  No, I'd like to see if Mr. Strojnik has

3     any additional evidentiary.

4          MR. STROJNIK:  Yes, I do.

5      May I stand up and stand over here?

6          THE COURT:  Sure.

7          MR. STROJNIK:  First, I just need to confirm that the

8     question of who AID was, the name of the AID 501c3 organization

9     is AID Foundation.  I looked it up when Your Honor was away.

10         The second thing is even though in Arizona divorce

11    proceedings are highly confidential, I am going to read,

12    because there seems to be some confusion about that, from the

13    order, and it says as follows:

14         MR. STILLMAN:  I object, Your Honor.  I'd like to see

15    the whole document myself.  I don't want to hear an excerpt

16    read by Mr. Strojnik.

17         THE COURT:  Overruled.  Go ahead.

18         MR. STROJNIK:  It says, "Wife is granted judgment

19    against husband for spousal maintenance arrearages in the

20    amount of $481,476.10.  The amount of arrearages is subject to

21    interest as provided by law.  Wife's irrevocable first-position

22    lien against husband's income and business receivables, from

23    any business or employment endeavors, present or future, is

24    security for the performance of husband's obligation to wife as

25    reflected in the UCC1 financing statement recorded with the

1    Arizona Secretary of State on November 7, 2013.  And

2    subsequently recorded UCC3 financing statement amendment

3    continuing the initial UCC1 dated August 30, 2018, is

4    confirmed.

5        "For the convenience of the parties, the wife shall have

6    the continuing right, but not the duty, to exercise control

7    over husband's personal and business income and expenses and

8    confirm to wife the right, but not the duty, to access all of

9    husband's basic accounts, credit cards, and personal and

10   business income with the right to transfer husband's spousal

11   maintenance subrogation from such accounts to wife."

12       We are here today, Your Honor, to determine whether or not

13   in addition to being able to pay approximately $500,000 in

14   arrearages on the divorce matter, I can also pay another

15   $21,000 to Mr. Stillman.

16       Well, I had filed under oath statements reflecting my

17   income.  When the Court first asked me what I had, I disclosed

18   that I have an old computer, my cell phone, and I have a lease

19   on a car.  The lease has no value.  The old computer and the

20   cell phone are valued at about $800.  At the time I had about

21   $100 in cash.  Today as I stand before you, I have $80 in cash.

22   I have nothing else.  It is my presumption that the Court will

23   recognize this because the hearing today produced absolutely no

24   evidence of any other income.  We went through old accounts

25   that have nothing to do with the situation today.  I fear,

1  though, that persistence in coming after me financially is

2  going to cause me to be in violation of the court order by the

3  La Paz County Superior Court judge with respect to my divorce.

4  That lien, that obligation, has absolute and unequivocal

5  priority over any other subsequent UCC lien or any subsequent

6  judgment.

7      So far as I have heard in evidence today, there's no

8  evidence contrary to what I'm telling you.

9      I would also like to say that I'm 69 years old.  I've seen

10  a lot of life.  And my life is a hard one.  It goes up and

11  down, up and down, it's been good, it's been bad.  Well, today

12  it's not so good, but I'm only 69.  In 20 years -- well, hell,

13  in five years, it's going to be up again.  Mr. Stillman's going

14  to get his money.  And then maybe in ten years, it will be down

15  again.  I don't know.  But I can tell you that life is a

16  heartbeat.  Particularly -- maybe I should say particularly my

17  life is a heartbeat, and right now the fact that it's down

18  doesn't mean that things aren't going to get taken care of.

19  It's my intent to do it, to take care of it, and with that, I

20  would respectfully request that the Court find that I'm not

21  able at this point in time to make the payment, as the Court

22  had ordered me, and to let me go home without the toothbrush.

23  Thank you.

24          THE COURT:  Okay.  Thank you.

25      I make the following findings:  On January 13 of 2021, I

1   ordered Mr. Strojnik to pay $21,995 forthwith.  Whatever

2   "forthwith" means, it certainly means by today, June 14th of

3   2021; therefore, Mr. Strojnik is in violation of this Court's

4   order.

5       To the extent Mr. Strojnik has testified that he didn't pay

6   it because he has no money, I find him to be not credible.

7       First of all, I think it's highly likely that this divorce

8   is a sham to shield his income and to allow him to pick and

9   choose what bills he wants to pay and what he chooses not to

10  pay.  He lives with his ex-wife, he travels with his ex-wife,

11  and it's clear to me from the exhibits that have been admitted

12  that Mr. Strojnik has the ability to pay this amount and has

13  failed to do so.

14      Therefore, I do find him in contempt of court.

15      I think that the bills submitted by the attorney as far as

16  the amount it has cost him to seek this contempt of court, so,

17  Mr. Stillman, I'm looking at these bills here, I think they're

18  reasonable, I think he charges a reasonable rate for the motion

19  and reasonable expenses as well.

20      Therefore, as a punishment for the contempt of court, I

21  will order an additional $22,251 in attorney's fees for a total

22  of $43,246.

23      I think what I'd like to do at this point is set a criminal

24  OSC.  I'll set it within -- do we have two weeks?  We don't

25  have any time.  Can we set it on for two weeks from today?

1    June 28 at 3:15 for a criminal contempt hearing.  If

2    Mr. Strojnik has not paid the amount that is due and owing by

3    that date, I'll consider whether he needs to be taken into

4    custody.

5        Mr. Strojnik, you say you're concerned about the order from

6    the family court and being taken into custody.  Maybe it's

7    being taken into custody that is required to get you to pay the

8    bills that the Court orders you to pay.  I suggest you use some

9    of the money that you've gotten from your settlement, you work

10   with Mr. Stillman, but you pay the 43,246.

11       Anything further?

12            MR. STROJNIK:  No, ma'am.

13            THE COURT:  Anything further?

14            MR. STILLMAN:  No, thank you, Your Honor.  Thank you

15   very much.

16            THE COURT:  Thank you.

17            MR. STILLMAN:  Appreciate it.

18            MR. STROJNIK:  So what was that 28th of June?

19            THE COURT:  That's the 28th of June at 3:15.

20            MR. STILLMAN:  Do you want me here for that criminal

21   proceeding?

22            THE COURT:  Well, the only thing I want to know is

23   whether he's paid his money or not.

24            MR. STILLMAN:  It would technically be in the nature

25   of an arraignment, I assume, or an order for remand to custody

1  at that time if he hasn't paid, so I'm not sure -- I'm happy to

2  be here.

3          THE COURT:  The only reason I need you there is I need

4  to know, so maybe you could file something by the morning of as

5  to whether Mr. Strojnik has paid the amount that's due and

6  owing.

7          MR. STILLMAN:  If Your Honor wants me to appear by

8  Zoom, I'm happy.

9          THE COURT:  That would be great.

10         MR. STILLMAN:  Thank you very much.

11         MR. STROJNIK:  Thank you.

12         THE COURT:  Thank you.

13     You're ordered to be here on June 28th at 3:15,

14  Mr. Strojnik.  Thank you.

15         MR. STROJNIK:  Yes, ma'am.  So I'm the only one that's

16  going to be here?

17         THE COURT:  You're the only one that's going to be

18  here because I'm going to be deciding whether I should take you

19  into custody for failure to pay the money.

20         MR. STROJNIK:  Why don't you just take me into

21  custody?

22         THE COURT:  You're refusing to pay the money?

23         MR. STROJNIK:  I'm not refusing.  I can't.

24         THE COURT:  I have seen the bills, Mr. Strojnik.  I

25  suggest you go back to the family court and you tell them.

1       So you're ordered to be back here on June 28th at 3:15 for

2   an arraignment on whether you should be taken into custody for

3   failure to pay the bills.

4           MR. STROJNIK:  Okay.

5           THE COURT:  I'll see you then.

6           THE WITNESS:  Should I bring my toothbrush then?

7           THE COURT:  You should.

8           MR. STROJNIK:  Okay.  Thank you.

9           THE COURT:  Thank you.

10                          ---oOo---

11

12                  C-E-R-T-I-F-I-C-A-T-I-O-N

13

14      I certify that the foregoing is a correct transcript from

15  the record of proceedings in the above-entitled matter.

16

17      Dated August 9, 2021, at San Diego, California.

18

19

20                      /Dana Peabody/
                        Dana Peabody,
                        Registered Diplomate Reporter
21                      Certified Realtime Reporter

22

23

24

25